UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


United States of America,          )
                                   )
                Plaintiff,         )
                                   )
        vs.                        )     File No. 1:19-cr-86
                                   )
Rode Wayne Vocu,                   )
                                   )
                Defendant.         )


TRANSCRIPT OF SENTENCING




Taken at
United States Courthouse
Bismarck, North Dakota
December 9, 2019




BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT COURT JUDGE --

<u>APPEARANCES</u>

MR. JONATHAN J. O'KONEK
U.S. Attorney's Office
220 E. Rosser Ave
P. O. Box 699
Bismarck, North Dakota 58502-0699

FOR THE UNITED STATES

- - - - - - - - - -

MR. CHRISTOPHER P. BELLMORE
Assistant Federal Public Defender
Federal Plaza
324 North Third Street, Suite 1
Bismarck, North Dakota 58501

FOR THE DEFENDANT

- - - - - - - - - -

Certificate of Court Reporter - Page 39

- - - - - - - - - -

1          (The above-entitled matter came before the Court, The

2     Honorable Daniel L. Hovland, United States District Court

3     Judge, presiding, commencing at 9:03 a.m., Monday, December 9,

4     2019, in the United States Courthouse, Bismarck, North Dakota.

5     The following proceedings were had and made of record in open

6     court with the defendant present.)

7                    - - - - - - - - - - -

8          THE COURT:  We'll open the record in the case of

9     United States versus Rode Vocu.  Is that how you pronounce it?

09:03   10          THE DEFENDANT:  Yes.

11          THE COURT:  Here on behalf of the federal government

12     is Assistant U.S. Attorney Jonathan O'Konek.  Representing the

13     defendant here is Attorney Chris Bellmore from the Federal

14     Public Defender's Office.

09:03   15          This is scheduled as a sentencing hearing on a arson

16     charge.  This is a binding Plea Agreement, so there won't be

17     any surprises here this morning.

18          I have reviewed the Presentence Investigation Report

19     before today.  I've also reviewed the victim impact statements.

09:04   20     I went back and reviewed the Plea Agreement and the Plea

21     Agreement Supplement and a Release Status Report from the

22     United States Probation Office.  Had you filed anything else,

23     Mr. O'Konek?

24          MR. O'KONEK:  No, Your Honor.

09:04   25          THE COURT:  Mr. Bellmore?

3

1          MR. BELLMORE:  No, Your Honor.

2          THE COURT:  Mr. Rocu (sic), did you -- or Vocu, I

3    should say, did you have an opportunity to read the Presentence

4    Investigation Report?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  And you've talked to your attorney about

7    that report and what it means for you?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Either counsel have any objections to the

10   facts contained in that report or the guideline calculations?

11         MR. O'KONEK:  No, Your Honor.

12         MR. BELLMORE:  No, Your Honor.

13         THE COURT:  Are there any witnesses that wish to

14   testify this morning?

15         MR. O'KONEK:  Yes, Your Honor.  We have one witness.

16         THE COURT:  Mr. Bellmore, do you have any?

17         MR. BELLMORE:  No, Your Honor.

18         THE COURT:  All right.  Mr. O'Konek, you may call the

19   witness.

20         MR. O'KONEK:  United States would call Karen Boyd

21   Hartman.

22         THE COURT:  We won't have her sworn in.  She can just

23   take a seat in the witness stand.  Once you get comfortable

24   there, ma'am, we'll have Mr. O'Konek ask you questions.  But

25   could you spell your full name for the court reporter, please?

4

1          MS. HARTMAN:  K-a-r-e-n, B-o-y-d, H-a-r-t-m-a-n.

2          THE COURT:  Thank you.

3          MR. O'KONEK:  Ms. Hartman, thank you for testifying

4     here today.  I just have a few questions.  Can you just please

09:05    5     take us through your background with the Memorial Church?  I

6     guess, where did you grow up first?

7          MS. HARTMAN:  I started out in Mandaree after the --

8     our home was flooded in Elbowoods.  My parents worked for the

9     BIA, and we lived in Mandaree for a couple of years, until the

09:06   10     homes got relocated in New Town and New Town was established

11     and then moved to New Town, where I grew up and graduated from

12     high school there.

13          MR. O'KONEK:  Ma'am, I know you have a letter you

14     wanted to read to the Court, but could you briefly just

09:06   15     describe to the Court your relationship with the Memorial

16     Church.

17          MS. HARTMAN:  Well, my mother and father and my older

18     sisters -- two older sisters attended church there in

19     Elbowoods, and so basically my memories are pictures and

09:07   20     stories of the church and the events that were held there.

21          My grandfather was a lifelong friend of Reverend

22     Case, and he was also a -- I don't know.  I guess nowadays they

23     would be -- call it a deacon maybe, but he went with Reverend

24     Case and -- to a lot of homes and introduced him to a lot of

09:07   25     people.  And then my grandfather also had a large family of

5

1    girls and a couple of sons, who one son, he sang with him in

2    the church.

3          And then my mother and a lot of her sisters played

4    piano in the church, and -- and it was just -- there was no

5    question.  I mean, you went to church, and that was it, and

6    that's how we were -- that's how we grew up.  That's how I grew

7    up.  I mean, there -- there, it was just assumed that you would

8    get ready on Sunday morning and go to church.

9          And when we moved into New Town, we started attending

10   the United Church of Christ, which is also part of the

11   congregational church system, and then went to -- out to the

12   Memorial Church for different events like weddings and our

13   annual church service that we -- that the congregational

14   churches would get together for.  And I remember the old white

15   canvas tents being set up where a lot of the parishioners from

16   all the various seven churches would camp for the weekend for

17   the church services and then one big human church service

18   culminating the event.

19         And -- and it just -- as different churches were

20   established in the different communities, the events at the

21   Memorial Church got less and less, and -- but we still had

22   sunrise services there and weddings and different events until

23   it got to be too dangerous with the inside falling apart and

24   being vandalized.  And we still had events there, but we had

25   them on the east side of the church, where there would be --

6

they'd haul chairs out and tables out, and we'd have church

services there, and --

MR. O'KONEK:  Ma'am, did it have a place of

significance for you in the community?

MS. HARTMAN:  Well, not only for me, but for my

family and probably a lot of the older -- older people.

MR. O'KONEK:  Ma'am, I know you had written a letter.

I want you to be able to read that for the Court, so please

feel free to take your time.

MS. HARTMAN:  Okay.  I addressed it to Ms. Lang.

Memories -- I don't even know if I can.  Memories etched in a

person's mind are repeated over and over like they happened

yesterday.  It has to be because the shock is a memory of a

genuine heart-felt loss, the devastation to your present world,

and denial of refusing to think of the events -- effects it

will have on the future.

I remember watching TV with my grandfather, Jefferson

B. Smith, when President John F. Kennedy was assassinated.  I

remember listening to the radio the night Robert F. Kennedy was

assassinated.  The day the Memorial Church was burned down is

now one of those memories that will be forever etched in my

mind.

I was cleaning and packing and making arrangements to

fly to Kansas when I received a text on Monday, April 22, 2019,

that was a copy of a Facebook message.  I've never been or ever

7

1   will be on Facebook.  With no indication of what it was going

2   to be, I recognized the name, so I had no worries it was a scam

3   or a prank.  There are no words to express the overwhelming

4   shock and grief I felt when I opened it and saw the church

5   burning.  My heart pounded.  My tears rolled.  I couldn't

6   comprehend this belief of what was happening.

7          I told my daughter I was driving out there, and she

8   stopped by with my grandson, who met me on the steps and just

9   wrapped his arms around me as I wept.  I immediately drove to

10  the site, shook up and tearful.  I could see smoke billowing

11  skyward as I approached from miles away.  Two other cars were

12  parked there, and I got out and couldn't contain my grief.

13  There are no words to express the sight of this loss upon

14  seeing the wreckage of what was left of our church.

15         The church has been in our family since before

16  Elbowoods was flooded.  I wasn't born yet, but I have seen

17  many, many pictures of family events being held there.  My

18  grandfather, Jefferson B. Smith, was a prominent parishioner, a

19  protege and a lifelong friend of the Reverend Harold W. Case,

20  the second missionary there who was instrumental in building --

21  in the building of the Memorial Church.  He took his family to

22  church every Sunday and insisted his daughters take piano

23  lessons and his eldest son sing so they could help with the

24  services.

25         While located in Elbowoods, it became the hub of

8

1   activity for the community.  After being relocated to its

2   present site, I remember church services and weddings and other

3   events.  I remember stopping there with my mother as she

4   reminisced.  I remember seeing a portrait of Poor Wolf hanging

5   downstairs, but was missing the next time we stopped there.

6   Due to structural concerns during the eighties, we no longer

7   attempted to use the sanctuary for services.

8        Since we live in New Town, my family attends the

9   United Church of Christ, a member of the Fort Berthold Council

10  of Congregational Churches, an alliance of five to seven

11  churches of which the reestablished Parshall Memorial Church is

12  also a member.  We held services at the Memorial Church site

13  outside, along the east side during the late summer, and the

14  sunrise service Easter morning for many years.  Needless to

15  say, our alliance hasn't met for services, but it has instead

16  met to decide what to do with the ruins.

17       Many of my family members, my grandparents, my aunts

18  and uncles and cousins are buried in the church cemetery.  The

19  cemetery will continue to be a part of many families' final

20  resting place for their loved ones, and I'm sure that we will

21  once again hold services there.  Those of us still a part of

22  the legacy of the Memorial Church and the Fort Berthold Council

23  of Congregational Churches will make sure our memories will

24  continue to live on.

25       To this day the grief and sadness is immeasurable.

9

1   When I see pictures of the past and now what it looks like

2   today, my heart bleeds with sorrow.  The only blessing is that

3   my ancestors and those who have recently passed away, my mother

4   and two sisters, are no longer here to have to withstand the

5   loss they would most certainly have in their hearts.  It would

6   be seen as another traumatic experience to add to the loss they

7   felt when they were removed from the bottomlands and relocated

8   to what is now the present-day Fort Berthold Indian

9   Reservation.

10          I can only hope that the young man responsible for

11  this devastating loss will some day have the empathy and regret

12  to realize and understand what the effect this had on the

13  elders and the community ties this church represented to so

14  many families.

15          Enclosed is a copy of the book my sister, Juanita

16  Helphrey, who passed away in 2018, wrote in 2011 entitled "Our

17  Churches, Our Story."  It has a section dedicated to the memory

18  of the Susan Webb Hall Memorial Congregational Church and now

19  called the Memorial Church upon its relocation.  She has such a

20  better history of the church than I can describe in only a few

21  paragraphs.

22          Sincerely and with a sad heart, Karen Boyd Hartman.

23          MR. O'KONEK:  And, ma'am, the last question I have

24  for you is, you mentioned that there would be a potential

25  memorial for the church.  Are there any plans to erect any sort

10

1   of monument in its place?

2       MS. HARTMAN:  I think the first meeting was in early

3   June, where we started with all -- all of the churches were

4   invited to decide what to do, and right now they're talking

09:17   5   about a memorial, a monument of some kind for sure.  I don't

6   know if they're going to -- there's been a lot of ideas thrown

7   around about what to do and -- ranging from an amphitheater to

8   a picnic area and maybe an altar, but nothing that I know of

9   that's been for sure.

09:17   10      MR. O'KONEK:  And as of today, has there been a

11  restitution figure for any sort of a monument?  Has that been

12  established yet, or are people still working on that number?

13      MS. HARTMAN:  I think they're still working on it,

14  although there's probably -- there was a meeting that I didn't

09:18   15  attend, I think.  I can't remember when it was that I wasn't

16  able to go to, so I don't know if -- what new information was

17  shared.  But there are people from the other Northern Plains

18  Conference, which is the Congregational Church of -- or United

19  Church of Christ, interested and attending our meetings from

09:18   20  Bismarck and all over to help us decide what to do and what

21  route to go.

22      MR. O'KONEK:  And, ma'am, the last question I have

23  for you, is there anything else that you wanted to tell the

24  Court about how this has affected you or the Fort Berthold

09:18   25  community, specifically the congregation that you're a part of?

11

1          MS. HARTMAN:  Well, I didn't address any kind of --

2   any kind of sentencing or anything in my letter.  I would just

3   hope that the young man understands what a devastating loss it

4   is to the elders.  A lot of the parishioners are older than me,

09:19   5   and they were so affected by the loss of their bottomlands that

6   they just see this as another loss to their hearts and their --

7   and their lives, and I hope that one day he understands the

8   hurt that he caused a lot of our elders, to have to rehash this

9   all over again after having moved -- having been forced to

09:19   10   leave their homes.

11          I hope that one day he understands and regrets and

12   has sympathy and empathy for what he did.  And in the end, I

13   know a lot of the elders have forgiven him, and I hope that one

14   day he can forgive himself after he understands and accepts the

09:20   15   loss that he caused.

16          MR. O'KONEK:  Yes, ma'am.  Thank you for your

17   testimony.  I have no further questions, Your Honor.

18          THE COURT:  Mr. Bellmore, any questions?

19          MR. BELLMORE:  No.  Thank you, Your Honor.

09:20   20          THE COURT:  All right.  Thank you, Ms. Hartman.  You

21   may step down.

22          MR. O'KONEK:  And, Your Honor, the United States does

23   not have any further witnesses.

24          THE COURT:  All right.  So I'll give both attorneys

09:20   25   an opportunity to outline their recommendations.  Mr. Vocu,

12

1    when the attorneys are done, I'll give you a chance to speak.

2    If there's anything you would like to say, you have the same

3    right as the attorneys to speak.  Mr. O'Konek.

4           MR. O'KONEK:  Thank you, Your Honor.  In this case

5    we're dealing with a final offense level of 17 and a criminal

6    history category of II, which establishes a guideline range of

7    30 to 37 months.

8           THE COURT:  Three, isn't it?

9           MR. O'KONEK:  I believe it was -- the guideline range

10   is 30 to 37 months.  That is the -- established by the --

11          THE COURT:  Right, with a Criminal History Category

12   III.

13          MR. O'KONEK:  I might have put down II.  It's likely

14   a III, yes, Your Honor.  And we're dealing in this case with a

15   binding Plea Agreement of a 30-month binding sentence.

16   However, the defense is able to ask for additional credit from

17   that binding sentence for the time that the defendant spent in

18   a residential re-entry center placement.

19          In this case the United States is requesting a

20   sentence of 30 months imprisonment, a three-year period of

21   supervised release, and payment of a hundred dollar special

22   assessment.

23          Pursuant to 18 United States Code, 3664 Delta 5,

24   we're asking that the Court keep restitution open for a period

25   of 90 days, which is permitted by statute.  That is simply to

13

give the congregation of the -- the church group out in Fort
Berthold time to determine the amount of restitution for any
sort of monument or memorial placed at the site in Fort
Berthold for this -- this tragic event, for the church now lays
in ruin.

      The reason for the sentence of 30 months is
appropriate is that the defendant committed the crime of arson,
and more importantly he set fire to the Memorial Congregational
Church in White Shield, on Fort Berthold Indian Reservation.
And although the church was in a -- I'll call a semiretirement
status, members of the Fort Berthold community still used it
for weddings, funerals, ceremonial services.  Individuals were
still buried at the location.

      And it served not only as a house of worship, a house
of God, but also as a beacon of light for members of the
community, specifically elders who had lived through the
removal with the Garrison Dam to Elbowoods -- from Elbowoods, I
should say, to New Town, and it's illustrated by Ms. Hartman
and as a specific significance not only to her, but to the
community.  It holds religious, cultural, historic significance
and is a beacon of light to think about the past, the future,
and the community as a whole.

      And the defendant's reckless actions removed that
beacon from the community, and there's nothing that can bring
that symbol back.

14

1        And we're asking for the 90 days to keep restitution

2  open to hopefully get a number for the dollar amount for

3  restitution so that the tribe can put some sort of memorial

4  together to recognize the loss, so they can get closure.

09:24    5        And that's why we're requesting not only that, but a

6  sentence per the binding terms of the Plea Agreement of

7  30 months imprisonment, a period of three years supervision,

8  and payment of the hundred dollars special assessment, Your

9  Honor.

09:24   10        THE COURT:  All right.  Thank you.  Mr. Bellmore.

11        MR. BELLMORE:  Thank you, Your Honor.  Rode Vocu is

12  23 years old.  He's from New Town.  Once this matter is put

13  behind him, Your Honor, it's his intention to return there.

14        He was granted a modification to his release terms on

09:24   15  December 1st so that he could leave the halfway house at Centre

16  and live with his mother for the last few days before the

17  sentencing hearing today.  He was allowed to do that because he

18  had earned his way.

19        Once he was released from custody, he was placed at

09:24   20  Centre.  Shortly thereafter we had a change of plea hearing,

21  and there were some minor infractions, so to speak, regarding

22  his term of pretrial release.  He had gained employment and had

23  lost it quickly.  He had had some difficulties, it was

24  reported, with his attitude at Centre.  The Court addressed

09:25   25  that with Rode and allowed him to continue on pretrial release

after the change of plea hearing, where he has turned it around.

I think the Court has received a pretrial status report this morning that indicates that since that time, Rode has done very well, and that is why he was allowed the opportunity to leave the halfway house and spend some time with his family back in New Town prior to today.

While he was at the halfway house, subject to the same strict rules that everyone is, he was able to find another job, which he maintained and worked nearly full-time, 40 hours, up until he was permitted to go home, so I think he has demonstrated his ability to succeed while on supervision and took every opportunity he could to demonstrate that in the months leading up to today's hearing.

Rode signed a Plea Agreement, went through the change of plea process, went through the PSR interview, and each instance has accepted responsibility for what took place.

Unfortunately, Rode had struggled with mental health issues, combined with controlled substances.  That amounted to what happened on the day -- what happened with the instant offense.

Fortunately because of the circumstances surrounding his use and being under the influence at the time of the offense, he can't recall with particularity what exactly took place, although he understands looking back on it, having

16

1   reviewed the discovery, that he was responsible and wanted to

2   take responsibility for that and has done so.

3         The Plea Agreement, as Mr. O'Konek indicated, is

4   binding on the Court.  It is essentially a guideline sentence

5   of 30 months, and the only exception to that was the ability

6   for the Court to consider some credit that the Court ordinarily

7   would give to defendants while on pretrial release.

8         And here we have two areas that I'd ask the Court to

9   consider in imposing a 30-month sentence prior to giving

10  Mr. Vocu some credit for that, and that would be, first, the

11  tribal arrest.  The PSR indicates on paragraph 45, Rode was

12  arrested on April 22nd.  He was charged with arson and criminal

13  mischief.  Those charges are pending, and that time is,

14  therefore, undischarged.  That would be from -- excuse me, from

15  April 22nd until he was federally arrested on June 5, 2019.  I

16  count that as 45 days or a month-and-a-half.

17        He spent some time in pretrial detention.  He went

18  through a bond interview and a detention hearing and was placed

19  on a halfway house waiting list.  That took about a month to

20  seven days.  BOP will calculate that exactly.

21        Important here, however, is that he was released to

22  Centre on July 12th of this year and remained there, as I

23  mentioned, until December 1st, when he was allowed to go home.

24  I calculate that to be 143 days or four months and 20 days, so

25  calculating --

17

1          THE COURT:  So why should I give him credit for all

2     of that when he wasn't on the best of behaviors during that

3     entire timeframe?

4          MR. BELLMORE:  As I mentioned, there was -- there was

5     a couple of incidents.  They didn't result in a petition being

6     filed.  They were kind of attitude concerns, and he had -- I

7     think that translated over to his employment.  If the Court may

8     remember, he was working at Culver's for a short period of

9     time, and he had never held a job, I think, that required that

10     kind of pace, and they --

11          THE COURT:  Pace at Culver's?

12          MR. BELLMORE:  Yeah, I think they're a pretty busy

13     place, and when he's on the food line, Your Honor, I think

14     that's a -- that's kind of a wake-up call.  And they didn't

15     have any patience for Mr. Rode, and unfortunately he didn't

16     last too long there, but he found a job at Burger King and

17     really turned it around.

18          I don't think pretrial services would have allowed

19     him to go home, outside of that, you know, restricted

20     environment at a halfway house that Centre provides if he

21     hadn't done well, and done well for a large -- a long period of

22     time.  I know that the box checks "noncompliance" on there, but

23     it's really that narrow window right when he was transitioning

24     from custody to the halfway house there were some bumps along

25     the way, but I think overall he has done well.

18

1    And I would note on there too, I think the status

2  report indicates that the pretrial services would go so far as

3  to recommend that he voluntarily surrender, if that was an

4  option.  I think that indicates that overall his time at Centre

09:29    5  on pretrial release has been successful.

6    It has been a wake-up call for him, and again, he has

7  taken advantage of the opportunity to be released, and that

8  compared to other defendants and the Court's position on

9  crediting that, I think that Rode should be given time for

09:29  10  that.

11    So with the month-and-a-half as the tribal time and

12  four-and-a-half months at Centre, I calculate that to be six

13  months, and so -- and pursuant with the Plea Agreement -- the

14  binding Plea Agreement allows the Court to consider a sentence

09:30  15  of 24 months, and we'd ask --

16    THE COURT:  Well, it doesn't say anything in the Plea

17  Agreement about getting him credit for time spent in tribal

18  court custody.  It says nothing about that.  I read it over

19  before the hearing.

09:30  20    MR. BELLMORE:  That would be 143 days, Your Honor, at

21  the -- as the halfway house time, and I would still note that

22  the tribal time was 45 days.

23    Going forward, as I mentioned, Rode intends to return

24  to New Town.  He knows the process of what's going to happen,

09:31  25  the steps that'll have to be taken, that he might be and

19

1   hopefully is afforded the opportunity for early release to get

2   back on his feet, to transition out of his prison sentence, to

3   go back to a halfway house and work.

4       If not, he understands that -- if he's not afforded

5   early release opportunity by BOP, it might be a condition of

6   his terms of supervised release, so he understands what's

7   headed for him.  Midterm, long-term goals for him, however, are

8   to return to New Town to live with his -- his family.  I would

9   ask the Court to consider --

10       THE COURT:  And do what for work and schooling, or --

11       MR. BELLMORE:  It's unclear right now, Your Honor.

12   He's going to have some time to kind of work through that,

13   hopefully some programming and some educational and vocational

14   opportunities at BOP for him.  He's, you know, going to have to

15   -- I think the PSR is -- where I would agree, he's going to

16   have to take some time to figure that out.  He's 23 years old,

17   and he's at that point in his life where he's going to have to

18   kind of think long-term as far as career-wise and making money

19   and providing for himself.

20       You know, with his history and -- and growing up, I

21   think this was -- this was the first step of that, and getting

22   out and holding that job at Burger King and the first time

23   really working in that kind of environment full-time was the

24   first step.  And so he's got that experience to kind of see if

25   that's something he wants to pursue or if there's something

1   else he'd be interested in.

2          He'll be able to have some opportunities, hopefully,

3   at BOP, and so I'd ask the Court to consider in its judgment

4   recommending to BOP that he be allowed to serve the remainder

5   of his sentence at Sandstone, Minnesota, or Oxford, Wisconsin,

6   based on their proximity to North Dakota.

7          As far as restitution, I think that it was understood

8   by the parties leading up to this that, you know,

9   unfortunately, there's -- there's obvious sentimental value to

10  this structure, to this church.  But the monetary value of

11  replacing it or fixing the damage, there isn't any information

12  on that because there wasn't anything to provide.

13         This was a building that Ms. Hartman indicated was

14  already vandalized from the inside-out, and to construct a

15  memorial, you know, and -- and ordering that as restitution, I

16  don't think that's in the -- that is restitution amount.

17         Restitution amount is the money for the damages.

18  It's based on an appraisal.  It's based on an investigation of

19  what was lost, and the -- to pay for a structure would be

20  something that, you know, Rode could consider out of his heart

21  and as a part of moving on and giving back to his community,

22  but I don't think that that is a restitution issue for the

23  Court to consider.

24         And I don't believe that there is a restitution

25  amount just based on the circumstances of this case, that this

21

was a church that, unfortunately, has been completely destroyed
based on the instant offense, but was already heavily
vandalized and damaged from the inside-out.  It just wasn't
worth anything as far as dollars are concerned.

But I'm not trying to downplay any sentimental value
that the church had on Ms. Hartman, her congregation or the
community.  I just don't think this is a restitution amount
that's appropriate for the Court, so I'll leave it at that,
Your Honor, and ask the Court to close the matter of
restitution today.

THE COURT:  Anything else?

MR. BELLMORE:  I have nothing else, Your Honor.

THE COURT:  Mr. O'Konek, what is your and the
government's position on time spent in tribal court custody,
which is not addressed in the Plea Agreement, time spent at
Centre, Inc.?

MR. O'KONEK:  Yes, Your Honor.  The tribal custody,
we believe, is outside the scope of the Plea Agreement.  The
language says residential re-entry center or a halfway house.

In terms of that, the United States normally would
join the defense in making a recommendation for credit.  In
this case I believe the Court articulated one of the concerns
that the United States has, which is the defendant's
noncompliance with certain conditions of release.

I guess I'll say as much just -- just to say that

22

1  we'll leave that up to the Court to determine whether or not --

2  if the Court feels that it's something that it should give to

3  the defendant.

4        I would note that this is the second time the

5  defendant has been in federal court.  And a situation like

6  this, where he has committed arson upon a church, is a very

7  serious offense.  And given his noncompliance at least at the

8  early term of his pretrial release, I believe that that weighs

9  against him receiving the credit, but ultimately we'll leave

10  that issue up to the Court.

11        MR. BELLMORE:  Your Honor, based on the government's

12  position, at least his tribal time is concerned, given the Plea

13  Agreement, I would withdraw that request, but still ask the

14  Court to give Mr. Vocu credit for time spent at Centre, Inc.,

15  in Mandan pending sentencing.

16        THE COURT:  All right.  So, Mr. Vocu -- is it Vocu?

17        THE DEFENDANT:  Yeah, it's Vocu.

18        THE COURT:  Vocu.  Okay.  I need to give you the same

19  opportunity to speak as everyone else has had, so if you wish

20  to say anything or you have any questions, you're free to speak

21  as well.

22        THE DEFENDANT:  Yeah.  Like I don't really know how I

23  wasn't compliant.  I passed every drug test.  I like may have

24  slept in a few times.  I don't think I ever argued with staff,

25  or anything.  I don't really get how I was not compliant.

23

1      Giving like --

2               THE COURT:  What about refusing to attend treatment

3      on September 2, 2019?

4               THE DEFENDANT:  I didn't refuse.  Like even my case

5      manager at Centre, she -- she thought that like -- I had a

6      meeting with my PO and my case manager, and we both thought --

7      and my PO said it was like up to me if I wanted to go to

8      treatment.  And I was really like not -- I was really like sad,

9      or whatever, about being like locked up, so I just wanted to

10     sleep all day, and I didn't really want stuff to do, so I just

11     never went.

12              And then I like -- I thought I didn't have to go, and

13     even my case manager thought I didn't have to go until Bobby

14     came to Centre and told me I had to go, so then I went.  And

15     then I just said, "I don't really think I need treatment"

16     during my evaluation, and then they said no and -- or they said

17     all right, and then I didn't know that I had to go.

18              And then when I found out I was supposed to go, then

19     I went, and then I finished treatment.  I graduated, and I was

20     -- I didn't like -- it's not like I was like, "I don't want to

21     go to treatment."  I just thought she gave me the option to go.

22              THE COURT:  All right.

23              THE DEFENDANT:  Yeah.  And then like with Culver's, I

24     didn't like mean to get fired.  Like I only worked there for

25     like two days.

24

1          THE COURT:  Well, most people don't mean to get

2     fired, but --

3          THE DEFENDANT:  Yeah, I just -- like I only worked

4     there two days, and I never really like flipped patties, and

09:37    5     stuff, super-duper quick, so, I mean, I just -- the lady was

6     like, "You're not -- you're too slow," and -- I don't know.  It

7     was just like -- I wasn't trying to be super slow, or anything.

8          And I don't really -- I'm just saying like I don't

9     get how I wasn't compliant, because like if you -- like what

09:38   10     Mr. Bellmore said, like if I wasn't compliant, why did they let

11     me go home for a week?  Like I don't know.

12          THE COURT:  I don't know either.

13          THE DEFENDANT:  Yeah, like I didn't have anything to

14     elaborate on like other than -- I mean, because I graduated

09:38   15     treatment too, so it's like -- I don't know.  Because like even

16     you told me if I did good, I would most likely get the time

17     served, or whatever, so I tried to be on my best behavior.

18     Like I haven't done no drugs, or anything, or -- I like

19     overslept a lot on some stuff, but that's like --

09:38   20          THE COURT:  Why do you oversleep?

21          THE DEFENDANT:  I don't know.  It was just like -- I

22     mean, like, you know, I was supposed to go job hunting like my

23     first few weeks there.  I'd sleep all day.  I don't know.  I

24     felt sick, and stuff.

09:38   25          THE COURT:  Felt sick?

25

1          THE DEFENDANT:  Yeah.  I don't know.  If you've ever

2    been like super-duper sad, you get sick.  I don't know -- or

3    not sick.  I mean, if you're ever tired, just drowsy like --

4          THE COURT:  All right.

09:38     5          THE DEFENDANT:  I don't know.

6          THE COURT:  So then these last few months you've been

7    working at Burger --

8          THE DEFENDANT:  Burger King, yeah.

9          THE COURT:  -- King?

10          THE DEFENDANT:  Yeah.

11          THE COURT:  What do you do there?

12          THE DEFENDANT:  Well, it's like easier.  I don't have

13    to flip patties, or anything.  It's just, you know, a machine.

14    Put them in the machine and --

09:39    15          THE COURT:  Oh, they have a hamburger press of some

16    sort?

17          THE DEFENDANT:  Yeah, they got a charbroil thing.

18    Just put them in there and then -- yeah.

19          THE COURT:  What do they pay you for that work?

09:39    20          THE DEFENDANT:  The same -- or I think it was like a

21    dollar more than Culver's.  I mean, it was 11 an hour.

22          THE COURT:  Eleven dollars an hour?

23          THE DEFENDANT:  Yeah.

24          THE COURT:  Really?

09:39    25          THE DEFENDANT:  Yeah.

26

1          THE COURT:  I might have to find a part-time job.

2    And how many hours a week?

3          THE DEFENDANT:  Well, it -- it was like almost 40 a

4    week.  Like I remember working like 12 days straight.  It just

09:39   5    depended, because we kept losing people, but, yeah, like almost

6    40.

7          THE COURT:  All right.  Anything more you want to

8    say?

9          THE DEFENDANT:  No, sir.

09:39   10          THE COURT:  So what are you going to do when you go

11    back to New Town after you serve this sentence?

12          THE DEFENDANT:  I don't know if I'm going to start

13    working or going -- go to school maybe.  I don't know.  I'll

14    probably just try and get a job.

09:40   15          THE COURT:  Doing what?

16          THE DEFENDANT:  I don't know yet.  I mean, I got like

17    a long time to think about it.  I don't know, just something --

18    maybe maintenance, or something.

19          THE COURT:  Why don't you go back to school and give

09:40   20    yourself some more opportunities in life in terms of work?

21          THE DEFENDANT:  Yeah.  Yeah, maybe.

22          THE COURT:  How'd you do in high school?

23          THE DEFENDANT:  Did all right.

24          THE COURT:  What does that mean?  Some people think

09:40   25    "all right" is getting Cs and Ds.  Some people think "all

27

1  right" is getting As and Bs.  What do you think "all right" is?

2            THE DEFENDANT:  Graduating.

3            THE COURT:  Graduating?

4            THE DEFENDANT:  Yeah.  I didn't do the best, no.

09:40  5            THE COURT:  What kind of grades did you get?

6            THE DEFENDANT:  Like Cs.

7            THE COURT:  All you got to do is wake up and go to

8  class to get a C in high school.

9            THE DEFENDANT:  Yeah, but I did get -- I do got --

09:41  10 like I'm a certified carpenter.  I went to college for a bit.

11           THE COURT:  Okay.

12           THE DEFENDANT:  Yeah.  I don't know.

13           THE COURT:  Well, I hope that you would.  I mean --

14           THE DEFENDANT:  I graduated college and --

09:41  15           THE COURT:  -- you wake up and go to class in college

16 and study a little bit, you can get Bs and Cs quite easy.  It's

17 not --

18           THE DEFENDANT:  I got As.  I don't know.

19           THE COURT:  All right.  And who's here in the

09:41  20 courtroom on your behalf today?

21           THE DEFENDANT:  My mom and my grandma -- my grandmas

22 and my little sister.

23           THE COURT:  They all live in New Town?

24           THE DEFENDANT:  My -- one of my grandmas do and my

09:41  25 mom and my little sister, and then one of them lives in

1  Minneapolis.

2        THE COURT:  Okay.  Anything else you want to say?

3  Any questions that you have?

4        THE DEFENDANT:  No, Your Honor.

09:41  5        THE COURT:  All right.  Anything else either attorney

6  wants to say?

7        MR. O'KONEK:  No, Your Honor.

8        MR. BELLMORE:  No, Your Honor.

9        THE COURT:  So I have reviewed the Presentence

09:42  10  Investigation Report.  I accept all of the facts contained in

11  that -- contained in that report and incorporate the sentencing

12  guideline calculations into my judgment.  The Presentence

13  Report established an overall offense level of 17 and a

14  criminal history category of III, with an advisory guideline

09:42  15  range of 30 to 37 months.  Neither party has requested any

16  departures or variances from that.

17        And this is a binding Plea Agreement that the Court

18  has accepted, so other than giving -- or considering time spent

19  in a residential re-entry center to reduce the sentence,

09:42  20  nothing else is permitted, and I refer specifically to

21  paragraph 17 of the Presentence Investigation Report.

22        The Release Status Report from September 3, 2019,

23  which is Document Number 27, reveals that the defendant had not

24  met the conditions of release at that time.  It discloses that

09:43  25  he was released to Centre, Inc., on July 15, 2019.  He was

29

1   referred to substance abuse evaluation at West Central Human

2   Service Center, at which time he told the evaluator he did not

3   want treatment, so the evaluation was ended without a

4   recommendation.

09:43   5        The defendant then agreed to have another evaluation

6   and was subsequently placed at the Contemplation Group at West

7   Central Human Service Center.

8        During the early stages of his stint at Centre, Inc.,

9   he was terminated from his employment at Culver's Restaurant.

09:43   10   I'm not sure how anybody gets terminated at Culver's, but he

11   did, and he obtained part-time employment at Burger King in

12   Mandan.  The Release Status Report reveals that when he was

13   directed by his case manager to find a second source of

14   employment, he started laughing and said, "No, dude, I'm just

09:44   15   chilling."  And he failed to attend treatment on September 2,

16   2019.

17        We had a change of plea hearing on September 3, 2019,

18   and it sounds like Mr. Vocu turned things around after that and

19   is working without incident at Burger King.  And there's no

09:44   20   write-ups at Centre, Inc., that I've been made aware of, so,

21   fortunately, he saw the light, I guess, after the change of

22   plea hearing, so I will give him credit from the date of the

23   change of plea hearing, September 3, 2019, for time that he

24   spent at Centre, Inc., which is three months.

09:45   25        But I'm not going to give credit for time spent

30

before that, which is not really indicative of somebody that's
fully compliant with the conditions there and complying with
all of the requests of the United States Probation Office.

So it will be my judgment, Mr. Vocu, that you shall
be committed to the custody of the Bureau of Prisons to be
imprisoned for a period of 27 months, thereafter placed on
supervised release for a period of three years.  I'm ordering
that you pay a special assessment of $100.  I'm not imposing a
fine.

I'll keep restitution open for 90 days, and then I'll
carefully consider any request, if there is one by that
timeframe.  And you, Mr. Bellmore and Mr. Vocu, will have an
opportunity to voice any objections to any request for
restitution if there's such a request made within that
timeframe.

In terms of the conditions of supervised release that
you're required to comply with after your release from the
custody of the Bureau of Prisons, those will be outlined in a
judgment that I'll sign today.  I'll probably sign that before
the noon hour here.

As soon as I sign the judgment, which is the final
paperwork, it gets electronically filed, and you'll get a copy
of that judgment.  It will list all of the conditions of
supervised release.

And when you're released from the custody of the

31

1   Bureau of Prisons, you'll be assigned a probation officer that
2   you'll have to check in with periodically, and that probation
3   officer will sit down with you and review all of these
4   conditions as well, so if you forget some, you need not be
5   concerned about it.  They'll be reviewed with you both in
6   person and you'll receive a written copy of the conditions as
7   well.

8        But everybody that's been sentenced in a federal
9   criminal case that's on any form of supervision has to, first
10  of all, comply with what are known as the standard conditions
11  of supervised release.  They are ordered for everyone in this
12  country on federal paper of any sort.

13       The standard conditions require that you live a
14  law-abiding lifestyle.  If you violate any laws while you're on
15  supervised release for three years, whether they're federal,
16  state, local laws or tribal laws, you've put yourself in a
17  position where you're -- have chosen to violate the conditions
18  of supervision.

19       Standard conditions prohibit you from using street
20  drugs of any sort.  Standard conditions prohibit you from even
21  associating with people that use street drugs.  You are
22  prohibited from associating with persons that have felony
23  convictions on their record.

24       You are prohibited for the rest of your life from
25  ever possessing firearms or ammunition.  Were you aware of that

09:46
09:47
09:47
09:47
09:48

32

1    prohibition?

2              THE DEFENDANT:  Oh, yes.

3              THE COURT:  Okay.  And you'll have to check in with

4    your probation officer as frequently as they require it of you.

5    If you don't check in, that's usually a sign that there's

6    problems, trouble going on, and you'll find yourself back here

7    in court.

8              Special conditions are also conditions that you're

9    required to comply with, and they include the following:  You

10   must totally abstain from using alcohol, street drugs,

11   inhalants and synthetic drugs while on supervision.  Abstain

12   means shall not use.  You must participate in any form of drug

13   or alcohol treatment recommended by the United States Probation

14   Office.

15             You'll be required to submit to random drug and

16   alcohol screening or testing at the discretion of the United

17   States Probation Office.  If you do not show up for a drug

18   test, that's considered to be a violation.  If there's any

19   evidence that you've tried to tamper with a drug or alcohol

20   test in any way, that's also considered to be a violation of

21   this condition.

22             You are -- you must not knowingly enter any bar or

23   other establishment where alcohol is the primary item of sale

24   while on supervision.

25             You must participate in any form of counseling or

33

treatment recommended by the United States Probation Office.
It could include, but it is not necessarily limited to mental
health treatment and counseling, attending classes, programming
of any sort recommended.

09:49      Another special condition is that you'll be -- you
can be placed, I should say, in a halfway house at any time
while you're on supervision, and if you're placed in a halfway
house, you're required to follow their rules and regulations.
So you've been in a halfway house.  You know how that system
09:50  works.

As a part of the Bureau of Prisons' policies, if
you're on good behavior, which I'm sure you will be while in
custody, you're allowed to be released after you've served
85 percent of your sentence.  Eighty-five percent of a 27-month
09:50  sentence, according to my math, is about 22 months.

And if you're on good behavior while you're in the
custody of the Bureau of Prisons, they usually allow people to
serve up to the last year of their sentence in a halfway house
with work release privileges, treatment opportunities,
09:50  opportunities to attend school, so there's a benefit to staying
on good behavior.

And the last condition of supervised release is that
you'll be subject to being searched while you're on
supervision, as is everybody else in this country that's
09:51  sentenced in a federal criminal case.  You're subject to a

34

search clause, which means you can be searched any time, any
place by a federal probation officer.

They don't need search warrants and they don't need
Court orders to search you or any place that you're living or
visiting or search any place that you may be working or motor
vehicles that you're traveling in.  They don't need search
warrants to search cell phones or computers or computer
devices.

Essentially everything you own or have access to can
be searched by the United States probation officer any time,
any place.  They may never do that in your case, but they have
a right to do it.

None of these conditions that I've ordered are out of
the ordinary.  They've all been challenged by other defendants
over the years.  To the best of my knowledge, none of these
conditions have ever been found to be unreasonable, but do you
have any questions about any of the conditions of supervision?

THE DEFENDANT:  No, sir.

THE COURT:  Finally, I need to inform you that you do
have a right to appeal if you feel you haven't been treated
fairly.  Every defendant can appeal after they've been
sentenced.

The time period for any defendant to appeal their
sentence is extremely short in the federal system.  As a
defendant you only have 14 days to appeal, and that starts to

35

1  run today.  So if you wish to appeal, all you need to do is

2  talk to Mr. Bellmore, and he can take care of filing any

3  necessary paperwork to protect your appeal rights.  Do you feel

4  that you understand that?

09:53    5           THE DEFENDANT:  Yes, Your Honor.

6           THE COURT:  You did sign a Plea Agreement in this

7  case, and in the Plea Agreement, which we reviewed in detail at

8  the change of plea hearing, you expressly agreed to give up all

9  of your rights of appeal in exchange for a sentence in

09:53   10  accordance with the Plea Agreement.

11           And I actually sentenced you three months below the

12  low end of the guidelines.  I have never seen a sentence

13  overturned that fell within the guidelines or fell below the

14  guidelines, but that doesn't mean you can't appeal.  I just

09:53   15  don't think it would get anywhere when you signed a Plea

16  Agreement and agreed not to appeal, but do you feel that you

17  understand when you would need to appeal what I've ordered here

18  today?

19           THE DEFENDANT:  Yes, Your Honor.

09:53   20           THE COURT:  Okay.  I will recommend to the Bureau of

21  Prisons that they place you in a low-security facility.  You

22  mentioned Sandstone, Minnesota, Mr. Bellmore, but does that

23  mean that you don't want me to recommend Duluth or Yankton,

24  South Dakota, or --

09:54   25           MR. BELLMORE:  Your Honor, I would -- yeah, if the

36

1    Court would do that, I would appreciate that.  We'd ask that

2    the Court include the camps located in Duluth, Minnesota, and

3    Yankton, South Dakota, as well.

4         THE COURT:  Okay.  So those are all low-security,

5    prison-camp type facilities that I would guess that you'd

6    probably end up in.  But is that acceptable to you, for me to

7    recommend that, or do you want me to recommend something

8    different?

9         THE DEFENDANT:  No, that's cool, Your Honor.

10        THE COURT:  All right.  So I hope that you can stay

11   out of trouble the rest of your life, Mr. Vocu.  You've been in

12   federal court twice now as a 23-year-old.  That's more than

13   most 23-year-olds ever step foot in a federal courtroom.  I

14   hope that you don't -- that you make better choices the rest of

15   your life, and this was a rather mindless, senseless criminal

16   act.

17        But either counsel have any objections to what's been

18   ordered here?

19        MR. O'KONEK:  No, Your Honor.

20        MR. BELLMORE:  No, Your Honor.

21        THE COURT:  And, Mr. O'Konek, you don't have an issue

22   with the sentence below the binding Plea Agreement?

23        MR. O'KONEK:  No, Your Honor.

24        THE COURT:  And, Mr. Bellmore, you had no objections?

25        MR. BELLMORE:  No objections, Your Honor.

1          THE COURT:  Okay.  So, Mr. Vocu, I'll remand you to

2     the custody of the U.S. marshals.

3          I want to thank Ms. Hartman for being here today and

4     for testifying and reading the letter that she had sent.  It's

09:55    5     not easy to come to federal court to testify at a sentencing

6     hearing like this, and I appreciate your willingness to do so

7     and to be here today.

8          With that, we will stand adjourned.

9          (Proceedings concluded at 9:56 a.m., the same day.)

10                   - - - - - - - - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>CERTIFICATE OF COURT REPORTER</u>

2          I, Sandra E. Ehrmantraut, a Certified Realtime

3     Reporter,

4          DO HEREBY CERTIFY that I recorded in shorthand the

5     foregoing proceedings had and made of record at the time and

6     place hereinbefore indicated.

7          I DO HEREBY FURTHER CERTIFY that the foregoing

8     typewritten pages contain an accurate transcript of my

9     shorthand notes then and there taken.

10          Dated:  May 1, 2020

11

12                         <u>/s/ Sandra E. Ehrmantraut  </u>
                         Certified Realtime Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25